UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| CORY J. SUMMERS, as personal representative for the estate of JAMES SUMMERS, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CROSSROADS GALVANIZING, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Cause No. 4:21-CV-074-PPS-JEM<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

On March 10, 2020, a tragic incident occurred at Crossroads Galvanizing in Lafayette resulting in the death of James Summers, an employee at the facility. As he operated a crane overhead, a bypassed safety latch on the crane hook caused a 570 pound load to fall, crushing him to death. Following an investigation, the Occupational Safety and Health Administration of the Indiana Department of Labor found that Crossroads had committed several safety violations, including a "knowing" violation in connection with the sketchy safety latch that caused the load to drop. Cory J. Summers, on his father's behalf, subsequently filed this wrongful death action against his father's employer, Crossroads.

Crossroads seeks dismissal of the case by invoking the exclusive remedy provisions of the Indiana Workers Compensation Act (IWCA), asserting that the complaint must be dismissed because it fails to allege an intentional tort that falls outside the exclusive provenance of the workers' compensation system. [DE 23.]

Crossroads has two main arguments for why Summers' wrongful death claim is blocked by IWCA. First, Summers fails to allege facts supporting the inference that Crossroads *deliberately* harmed his father or knew with certainty that he would be injured as a result of the safety violations. Second, the complaint lacks sufficient detail to establish Crossroads' liability, as an employer, for any alleged torts of its employees. [DE 24; DE 39.] In response, Summers argues that the complaint includes facts which, if accepted as true, are sufficient to establish "the legal elements of a wrongful death claim in Indiana, . . . [and] show the intent of Crossroads to injure" his father, and which further establish that Crossroads itself intended his father's injury. [DE 38.]

I find what happened to James Summers deeply troubling. If one believes what is in the complaint, Crossroads tolerated, and perhaps even endorsed, significant safety risks at its Lafayette facility. Indeed, that is what IOSHA's investigation revealed. I do not believe that any employee should have to work in an environment that plays fast and loose with safety procedures, and it appears that Crossroads has rightly been ordered to clean up shop. However, Indiana law is clear: unless an employee's personal injuries stem from his employer's deliberate intent to inflict an injury or actions taken with actual knowledge that an injury is certain to occur, the IWCA provides the exclusive remedy. Because Summers' complaint fails to plead facts sufficient to support the reasonable inference that Crossroads purposely harmed or certainly knew that harm would befall his father as a result of its violation of workplace safety rules, the wrongful death claim must be dismissed.

## Facts

On October 15, 2021, Cory J. Summers, a citizen of Indiana, filed a civil action against Crossroads Galvanizing in Tippecanoe Superior Court. [DE 1; DE 2.] Crossroads, a limited liability company with Missouri citizenship, invoked this Court's diversity jurisdiction and removed the action. [DE 1.] Summers filed his First Amended Complaint for Damages for Wrongful Death, on February 14, 2022. [DE 20.]

The operative complaint alleges that James Summers, an employee at Crossroads Galvanizing, was killed while operating an overhead crane (Crane 1) when a "faulty hook" on the crane dropped its load, causing him to suffer serious bodily injury. [DE 20, ¶¶ 5, 7–9.] The Occupational Safety and Health Administration of the Indiana Department of Labor investigated Crossroads' facility in the aftermath of the incident and issued a report summarizing its findings. *Id.*, ¶ 10. IOSHA concluded that Crossroads had committed several "serious violation[s]" on the site, including failure to complete inspections of the crane at specified intervals, failure to inspect ropes once a month, failure to properly attach the load to the load block hook by means of slings or other approved devices (rather than using "in-house fabricated lifting device[s]"), failure to ensure employees wore appropriate eye or face protection, failure to properly install and inspect electrical equipment, and failure to post danger tags on Crane 1. IOSHA further concluded that Crossroads committed a "knowing" violation by "operating [Crane 1] with a bypassed safety latch on the crane hook." *Id.*, ¶¶ 11–14; *see also id.*, Ex. A (Safety Order and Notification of Penalty).

As part of the investigation, an unnamed Crossroads employee stated that he had operated Crane 1 and had witnessed other employees "operating the cranes when the safety latch was not properly in place." *Id.*, ¶ 15. The "safety latches were routinely tied back on the cranes" — seemingly "every single day he came into work." *Id.*, ¶ 16. After the employee raised the issue with the safety latches to "Crossroads Galvanizing," the employee was "informed by Crossroads Galvanizing [that] it was fine to bypass the safety latches" and keep operating the cranes without proper safety latches. *Id.*, ¶ 17. The same employee reportedly testified that "multiple employees" had "complained [that] the safety latches on the cranes they were operating were unsafe and dangerous," and in response, "Crossroads Galvanizing corporate officers and policy makers had a meeting to specifically address the issues about the safety latches" approximately "two to three months prior to the incident which resulted in James [Summers'] death." [DE 20, ¶¶ 18–19.]

Unfortunately, "nothing was changed prior to the incident" as a result of this meeting. *Id.*, ¶ 20. Some time after Crossroads held its internal meeting, "multiple employees" (again, unidentified) all had a "meeting with Crossroads Galvanizing in a break room," and an employee "specifically stated to Crossroads Galvanizing that[] 'somebody is going to lose their life. You are going to kill somebody.'" *Id.* "Crossroads Galvanizing" allegedly responded with the following disturbing statement: "[W]hatever they need to bypass to get the job done, they can do it. I don't want to hear no more about it. When someone dies we will come across that when the time comes."

4

*Id.*, ¶ 21.

Summers further claims that "by and through its corporate officers and policy makers," Crossroads "personally tied back the safety latch in order to make the process move faster." *Id.*, ¶ 23. Crossroads "personally" took this action, despite being informed "by the employees that such disregard for safety would result in injury or death," because Crossroads "was more concerned about maximizing production than safety." *Id.*, ¶¶ 23–24. Elsewhere in the complaint, Summers remixes this theory, suggesting that Crossroads had established a *policy* about the safety procedures that someone else carried out. Summers claims that Crossroads violated safety rules "pursuant to a policy made through [its] regular decision-making channels," *id.*, ¶ 26, and by enforcing this reported "policy and decision," Crossroads' "corporate officers and policy makers" (also unnamed) "intended the injury or death of James [Summers]," *id.*, ¶ 27.

Summers originally asserted separate counts against Crossroads sounding in negligence and intentional tort. [DE 2.] The operative complaint takes a different tack, folding the foregoing allegations into a sole cause of action for wrongful death under Indiana law. [DE 20, ¶¶ 28–35; *see also id.* at 2.] Summers tries to prop up his sole count for relief with a potpourri of legal conclusions. He asserts that Crossroads "*intentionally* did not establish and maintain conditions of work which were reasonably safe and healthful for employees" and "free from recognized hazards" likely to cause serious bodily harm. *Id.*, ¶ 29 (emphasis added). Despite "*knowing of* [the] faulty condition" of Crane 1, Crossroads "*intentionally* failed and refused to replace the faulty hook" on the

5

crane. *Id.*, ¶ 31 (emphasis added). While the employees were "unaware of the totality of the risks" they were exposed to as a result of the unsafe procedures, "Crossroads Galvanizing was on notice that injury or death to an employee working with or around Crane 1 was *certain to follow*" from the conduct previously outlined in the complaint. *Id.* ¶¶ 32–33 (emphasis added). To sum it all up, Crossroads' "intentional conduct" exposed employees to struck-by hazards, and as a "direct and proximate result" of that conduct Summers' father was killed. *Id.*, ¶ 34. With that all said, Summers seeks as recompense damages available pursuant to the Indiana wrongful death statute, Indiana Code §§ 34-23-1-1 and 34-23-1-2. *Id.*, ¶ 35.

## Discussion

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). At this stage, of course, I must accept the complaint's allegations as true and draw all reasonable inferences in Summers' favor. *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19 F.4th 1002, 1006 (7th Cir. 2021). However, to avoid dismissal under Rule 12(b)(6), his claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires a plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Seventh Circuit has explained

that the plaintiff must plead facts that "suggest a right to relief that is beyond the speculative level," which requires alleging "enough details about the subject-matter of the case to present a story that holds together." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "[S]heer speculation, bald assertions, and unsupported conclusory statements" in the complaint fail to meet this burden. *Taha*, 947 F.3d at 469.

Indiana Code § 34-23-1-1 and § 34-23-1-2 permit a decedent's personal representative to "maintain an action" on the decedent's behalf if the decedent "might have maintained an action had he . . . lived." In Indiana, actions for wrongful death are "purely creatures of statute"; at common law "there was no claim in tort for the death of another because a personal injury action did not survive the death of the injured party." *Melvin v. Patterson*, 965 F. Supp. 1212, 1215 (S.D. Ind. 1997) (citing *Ed Wiersma Trucking Co. v. Pfaff*, 643 N.E.2d 909, 911 (Ind. Ct. App. 1994)). As such actions are purely statutory, they are "strictly construed." *Moore v. Hamilton Southeastern Sch. Dist.*, No. 1:11-CV-01548-SEB-DML, 2012 WL 13028664, at *4 (S.D. Ind. Sept. 28, 2012). "[O]nly those damages prescribed by statute are recoverable." *Wiersma Trucking*, 643 N.E.2d at 911. Thus, a plaintiff pursuing a wrongful death action may seek "damages . . . limited to the pecuniary loss suffered by those for whose benefit the action may be maintained," such as "the assistance that the decedent would have provided through money, services, or other material benefits," and spouses and dependent children may further obtain "emotional damages," such as "damages for the loss of care, love and

affection . . . [and] parental training and guidance." *Id.* Courts have also clarified that where a plaintiff seeks recovery for wrongful death sounding in negligence, the plaintiff bears the burden to prove "(1) a duty owed by the defendant to the decedent, (2) a breach of that duty, and (3) an injury proximately caused by the breach." *Moore v. Corizon Health Inc.*, No. 1:17-CV-00987-SEB-DML, 2018 WL 1522658, at *7 (S.D. Ind. Mar. 28, 2018) (citing *Greathouse v. Armstrong*, 616 N.E.2d 364, 368 (Ind. 1993)).

The IWCA created a process for workers hurt on the job to seek compensation from their employers. In so doing, the law provides that any "rights and remedies granted to an employee . . . on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death." Ind. Code §§ 22-3-2-6. Thus, the IWCA operates coextensively with the wrongful death statute. It provides an employee's sole remedy against an employer for injuries occurring by accident, which arise out of and in the course of his employment.[1] *Sims v. U.S. Fid. & Guar. Co.*, 782 N.E.2d 345, 349–50 (Ind. 2003); *Tippmann v. Hensler*, 716 N.E.2d 372, 374–75 (Ind. 1999). Where, as here, "a plaintiff's own complaint recites facts demonstrating the employment relationship and its role in

---

[1] Although Indiana courts have held that objections based on the IWCA's exclusivity provisions should be raised in a motion to dismiss for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1), the Seventh Circuit has found that the applicability of the IWCA is properly raised in a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See GKN Co. v. Magness*, 744 N.E.2d 397, 400 (Ind. 2001) (citing *Foshee v. Shoney's, Inc.*, 637 N.E.2d 1277, 1280 (Ind. 1994)); *Seekins v. Dolgencorp LLC*, No. 1:17-CV-4415-JMS-TAB, 2019 WL 2026901, at *1–*2 (S.D. Ind. Mar. 15, 2019) (citing *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778–79 (7th Cir. 2002)); *Reiber v. Mathew*, 271 F. Supp. 3d 968, 975 n.9 (N.D. Ind. 2017) (citing *Tacket v. Gen. Motors Corp.*, 93 F.3d 332, 334 (7th Cir. 1996)).

the injuries alleged," the plaintiff carries the burden "to demonstrate some grounds for taking the claim outside the Worker's Compensation Act." *Perry v. Stizer Buick GMC, Inc.*, 637 N.E.2d 1282, 1286 (Ind. 1994).

The IWCA's exclusivity provisions are "expressly limited to personal injury or death arising out of and in the course of employment which occurs '*by accident*.'" *Talevski v. Carter*, No. 2:05-CV-184, 2006 WL 276927, at *5 (N.D. Ind. Feb. 1, 2006) (emphasis added) (citing *Baker v. Westinghouse Elec. Corp.*, 637 N.E.2d 1271, 1273 (Ind. 1994)). In *Baker*, the Supreme Court of Indiana, in response to a certified question from the U.S. District Court for the Southern District of Indiana, addressed "[w]hether there is an intentional tort exception to the exclusivity provision of the Indiana Worker's Compensation Act." 637 N.E.2d at 1272. The Court determined that "certain" intentional torts form an "exclusion" from the IWCA, rather than an "exception" to the exclusivity provisions of the Act: the statute "by its terms does not bar certain intentional tort actions." *Id.*; *see also Owens v. DSM Eng'g Plastics, Inc.*, 641 N.E.2d 1271, 1273 (Ind. Ct. App. 1994). On the substantive issue, the Court reasoned that a workplace injury occurs "by accident" only "when it is intended by neither the employee nor the employer." 637 N.E.2d at 1273 ("[I]ntentional torts of an employer are necessarily beyond the pale of the [A]ct."); *see also, e.g., Eichstadt v. Frisch's Restaurants, Inc.*, 879 N.E.2d 1207 (Ind. Ct. App. 2008) (holding that employee failed to establish that injuries were not "by accident," and thus not barred by IWCA, where employee alleged that she was injured when restaurant manager struck her with a clipboard and there was no

9

evidence that the corporate entity intended her injuries).

The Court went on to more precisely delineate when "certain" intentional torts are not barred by the IWCA in two key ways. *Baker*, 637 N.E.2d at 1275. First, the employer's requisite "level of intent" demands "nothing short of *deliberate intent to inflict an injury*, or *actual knowledge that an injury is certain to occur*." *Id.* (emphasis added). A reckless or wanton breach of a duty of care owed to an employee will not suffice to show the employer "intended" the employee's harm. *Id.* Indeed, an employer may know that "the injury was *substantially certain*," but even that knowledge will not remove resultant harm from the scope of the IWCA. *Id.* at 1275 & n.5 (emphasis added). Since the overwhelming majority of workplace injuries are not coordinated hit jobs, requiring the typical employee to meet such a high standard is like asking me to beat Tiger Woods in match play. *Cf. Bailor v. Salvation Army*, 854 F. Supp. 1341, 1353 (N.D. Ind. 1994) (noting the "stringent, specific intent standard" adopted by state courts). But as the Court explained in *Baker*, this demanding standard serves important policies: "[A] high standard of culpability" is necessary to "avoid the workmen's compensation scheme being 'swallowed up' by a glut of common law suits outside the Act.'" 637 N.E.2d at 1275 (quoting *Nat'l Can Corp. v. Jovanovich*, 503 N.E.2d 1224, 1233 n.14 (Ind. Ct. App. 1987)).

Second, the Court specifically considered and rejected a *respondeat superior* theory of liability. That is shorthand for saying that an employer, like Crossroads, typically cannot be held legally responsible for the wrongful acts of its managers. Only injuries

"the employer itself . . . intended" count as intentional torts exempted from the Act. 637 N.E.2d at 1275 (applying *Nat'l Can*, 503 N.E.2d at 1233). Thus, "[I]t must be the employer who harbors the intent and not merely a supervisor, manager or foreman." *Id.*

Crossroads asserts that Summers' complaint is deficient on both fronts, requiring dismissal for failure to state a claim under state law. Summers confusingly responds that his complaint is sufficient to establish the elements of a cause of action for wrongful death — under the standard applied to wrongful death actions sounding in *negligence.* [DE 38 at 6–7 (citing *Lane v. Walgreen Co.*, No. 1:12-CV-01180-SEB, 2014 WL 2881543, at *7 (S.D. Ind. June 24, 2014) (quoting *Hays v. Bardasian*, 615 F. Supp. 2d 796, 800 (N.D. Ind. 2009) ("To premise recovery on a theory of negligence, as the Plaintiffs do in this case . . . .")))].] He goes on to argue that the complaint not only establishes those elements (duty, breach, causation, damages), but also "the intent of Crossroads to injure Summers." [DE 38 at 7.] As previously outlined, if Summers only pleads facts sufficient to make out a claim for wrongful death based on Crossroads' negligence or recklessness, his claim must be dismissed pursuant to the IWCA. So, I will analyze whether he plausibly alleges that Crossroads intentionally injured his father.

Stripping away all of the vague and conclusory allegations, and homing in on the factual content in the complaint, Summers does not allege facts sufficient to support the conclusion that Crossroads undertook the relevant safety procedures with "deliberate intent" to harm James Summers. At most, Summers attributes to Crossroads anonymous statements that betray a callous indifference to the safety of its employees,

11

and attributes to nameless employees complaints that an employee could die if the safety issues were not remedied (before the incident) and accusations that Crossroads murdered James Summers (after the fact). That is a far cry from claiming that Crossroads acted with deliberate intent (or the desire) to harm James Summers when it maintained unsafe procedures, including using faulty crane hooks. Indeed, there is no suggestion in the complaint that Crossroads held any animus toward James Summers or otherwise had reason to cause him harm. Summers even seems to confirm that Crossroads' motivations for the risky safety procedures had nothing to do with hurting his father — he specifically claims that Crossroads bypassed the safety latch on crane hooks "to make the process move faster," and that Crossroads told concerned employees to bypass the safety latches "to get the job done." [DE 20, ¶¶ 21, 23, 25.]

Other courts have declined to find facts similar to ours sufficient to establish an employer's deliberate intent to injure an employee. *See, e.g.*, *Blade v. Anaconda Aluminum Co.*, 452 N.E.2d 1036, 1038 (Ind. Ct. App. 1983) (affirming dismissal of complaint alleging employer intentionally committed safety violations, resulting in the plaintiff's death in a furnace explosion, because while the employer "intentionally pursued a course of conduct which jeopardized its worker's safety," such conduct "can at most be characterized as *grossly negligent or wanton*" (emphasis added)); *Bailor*, 854 F. Supp. at 1353–54 (holding that series of detailed, specific acts and omissions taken by employer that allegedly led to plaintiff's violent rape and beating "support[ed] an inference of reckless or wanton behavior," but fell short of a "course of action taken with the specific

12

intent to cause [the] attack, or with any substantial certainty that an attack would occur"); *Tribbett v. Tay Mor Indus., Inc.*, 471 N.E.2d 332, 332–34 (Ind. Ct. App. 1984). As the Court of Appeals observed in *Agee v. Central Soya Co.*, conduct may surpass "aggravated negligence," and include "such elements as knowingly permitting a hazardous work condition to exist, or willfully and unlawfully violating a safety statute" without reaching "the kind of actual intention to injure that robs the injury of accidental character." 695 N.E.2d 624, 626–27 (Ind. Ct. App. 1998) (citing 2A Lawson, *Workmen's Compensation Law* § 68.13 at 13–15 (1982)). Summers failed to raise any analogous cases to my attention that support his position, which reinforces my conclusion that his claims fail to show Crossroads acted with "deliberate intent."

It's a closer question whether Summers' constellation of anonymous statements, taken as true, forms a sufficient basis to infer that Crossroads had "actual knowledge that an injury is certain to occur." In sum and substance, state investigators concluded that Crossroads committed a "knowing" violation of safety regulations when employees "were exposed to struck-by hazards due to operating the crane with a bypassed safety latch on the crane hook." [DE 20, ¶¶ 9–10, 14; *see also id.*, Ex. A.] An unnamed employee told state investigators that the latches were "routinely" tied back, that the employee had personally witnessed this occurring "every single day" he went to work, and that employees had complained to Crossroads about the safety latches. *Id.*, ¶¶ 16–19. After Crossroads held a meeting to address the issue, unnamed employees (it's unclear if they are the same individuals) approached "Crossroads Galvanizing in a

break room" and stated in no uncertain terms, "[S]omebody is going to lose their life. You are all going to kill somebody." *Id.*, ¶¶ 19–20. "Crossroads Galvanizing" (presumably a human being, not the limited liability company) responded by telling employees that they just needed to "get the job done" and if "someone dies we will come across that when the time comes." *Id.*, ¶ 21. After James Summers was killed, employees "accused Crossroads Galvanizing of intentionally murdering [him] because Crossroads Galvanizing knew of the faulty hooks and did nothing." *Id.*, ¶ 22.

Courts have found that similar facts fail to establish an employer's certain knowledge that a worker's injury will follow. *See, e.g.*, *Agee,* 695 N.E.2d at 626–27 (affirming dismissal of complaint alleging employer intentionally injured employees where plaintiff asserted that the employer's "management personnel had ordered a particular procedure at the plant which created the possibility of generating an explosion," and "conclusions set forth in the [plaintiff's supporting] affidavits do not add up to actual knowledge . . . that injury was certain to occur," even if they "might reveal conduct amounting to gross negligence or even recklessness"); *Williams v. Delta Steel Corp.*, 695 N.E.2d 633, 634 & n.3 (Ind. Ct. App. 1998) (affirming dismissal of complaint, and summarily concluding that claim that manager "was aware of the dangerous condition of the machine that injured [the plaintiff]" and "still required [him] to use the machine" failed to establish employer's actual knowledge that injury was certain to occur); *Lawson v. Raney Mfg., Inc.*, 678 N.E.2d 122, 126–28 (Ind. Ct. App. 1997) (affirming dismissal of complaint brought by employee who had both hands amputated

14

by punch press machine after accidentally tripping its electrical foot switch, finding that safety consultant's affidavit describing employer's departure from industry standard failed to establish that the employer had actual knowledge harm was certain to occur).

In *Agee*, the plaintiff relied, in part, on IOSHA citing the defendant for failing to keep its workplace free from hazards. But the court rejected such evidence as insufficient to establish the high level of intent required to avoid IWCA's exclusivity provisions. 695 N.E.2d at 628. In *Lawson*, the court acknowledged that "short of a concession by the employer that he had actual knowledge an injury was certain to occur, the plaintiff-employee would have to demonstrate actual knowledge by circumstantial evidence." 678 N.E.2d at 128. But the court found that an affidavit from a professional safety expert criticizing the employer's alleged safety violations as beyond the pale was not "conclusive by itself" of the employer's knowledge that its shady practices were certain to cause the plaintiff's injuries. *Id.* at 127–28. The plaintiff in *Lawson* failed to claim sufficient circumstantial factors establishing such knowledge. For example, in addition to relying on an expert's opinion concerning the expected result of her employer's allegedly deficient safety procedures, the plaintiff could have provided more specific allegations concerning other employees who "suffered similar injuries on the same type of machine," or the number and frequency of complaints submitted to managers, or allegations that the employer "regularly observed and approved the use of the press without guards." *See id.* Such details would have aided the inference that the employer had actual knowledge that an injury was certain to occur from the

15

procedure. In this case, I similarly conclude that Summers' allegations—while perhaps sufficient to establish Crossroads' gross negligence or recklessness—do not form a basis to infer that Crossroads acted with "actual knowledge" that Summers' injury was "certain" to occur.

## Conclusion

For the foregoing reasons, Crossroads' motion [DE 23] is **GRANTED**. The First Amended Complaint [DE 20] is **DISMISSED**. However, Summers will be given thirty days to file an Amended Complaint if he believes he can cure the deficiencies in the complaint outlined above.

**IT IS SO ORDERED**.

ENTERED: August 22, 2022.

                                                 /s/ Philip P. Simon
                                                 PHILIP P. SIMON, JUDGE
                                                 UNITED STATES DISTRICT COURT