UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| CORY J. SUMMERS, as personal | ) | |
| representative for the estate of | ) | |
| JAMES SUMMERS, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:21-CV-074-PPS-JEM |
| | ) | |
| CROSSROADS GALVANIZING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

James Summers was tragically killed on the job, and his son claims in this lawsuit that his father died due to his employer's gross negligence and abject indifference to his safety. After dismissing an earlier version of the Complaint because of the exclusive remedy provisions of Indiana Workers' Compensation Act [DE 41; *see* DE 20], Summers filed a Second Amended Complaint trying to plead around that inflexible rule. [DE 44.] Summers former employer, Crossroads Galvanizing, again seeks dismissal on the same grounds. [DE 45.] Regrettably, although Summers' new complaint provides more detail, it still suffers the same fundamental flaw as the previous version. Although the allegations in the complaint (if believed) establish that Crossroads acted in a grossly negligent manner, they do not show that Crossroads deliberately intended to harm Mr. Summers or knew of an inevitable harm that would befall him. Therefore, once again, his only remedy is through Indiana's Workers' Compensation Act. The Second Amended Complaint will therefore be dismissed, this time with prejudice.

## Background

On October 15, 2021, Summers, a citizen of Indiana, sued Crossroads in Tippecanoe Superior Court on his father's behalf. [DE 1; DE 2.] Crossroads, a limited liability company with Missouri citizenship, invoked this Court's diversity jurisdiction and removed the action. [DE 1.] Summers filed his First Amended Complaint for Damages for Wrongful Death on February 14, 2022. [DE 20.]

I dismissed the First Amended Complaint due to Summers failing to plead facts sufficient to support the inference that Crossroads purposely harmed or certainly knew that harm would befall him by violating workplace safety rules. [DE 41.] That is what is required to avoid the exclusive remedy provision of the Indiana Workers Compensation Act. *Id.* at 8-15. *See generally* Ind. Code § 22-3-2-6. I gave Summers one last chance to file another amended complaint to cure the deficiencies detailed in my opinion and order [DE 41 at 15], and he timely did so. [DE 44.] The core allegations in the Second Amended Complaint essentially restate the allegations in earlier versions of the complaint. I fully detailed those allegations in my initial opinion granting the first motion to dismiss and won't repeat them here. [DE 41.] Instead, I will focus principally on the new allegations in the Second Amended Complaint.

On March 10, 2020, a tragic incident occurred at Crossroads Galvanizing in Lafayette, resulting in the death of James Summers, an employee at the facility. [DE 44, ¶¶ 7-9.] While Summers was operating an overhead crane (which is specifically referred to in the complaint as "Crane 1"), a bypassed safety latch on the crane hook caused a

570-pound load to fall and crush Mr. Summers to death. *Id*. In the aftermath of the incident, the Occupational Safety and Health Administration of the Indiana Department of Labor ("IOSHA") investigated Crossroads' facility and issued a report finding several safety violations. [DE 44, ¶ 33.]

According to the Complaint and the IOSHA report, which I accept as true for present purposes, it's pretty clear that Crossroads ran a slipshod workplace without much concern for worker safety. The violations found by IOSHA include: a failure to complete inspections of the crane at specified intervals, *id.*, ¶ 35; failure to inspect ropes once a month, *id.*, ¶ 36; failure to properly attach the load to the load block hook using slings or other approved devices, *id.*, ¶ 37; and failure to maintain functional safety latches on the hooks and by committing a "knowing" violation by "operating Crane 1 with a bypassed safety latch on the crane hook," *id.*, ¶¶ 38–41.

As part of its investigation, IOSHA deposed a Crossroads employee named Jiovanni Campbell. *Id.*, ¶ 11. During the deposition, Campbell testified that he witnessed other employees regularly operating cranes without safety latches adequately attached and that the safety latches were tied back "every single day" he came into work. *Id.*, ¶¶ 11-12. *See also* DE 44-1 (Campbell Deposition Tr.). Campbell reported this issue to Crossroads' management, including Philip Howell and Jeff Reynolds. [DE 44, ¶ 13.] Still, they ignored his concerns and instructed him to continue operating without the safety latches. *Id*. At the time, Reynolds was listed as Crossroads' contact person and representative for receiving safety orders, penalty notifications,

failure to abate notices, and providing signatures for IOSHA notices. Reynolds was also referred to as the "plant manager." *Id.*, ¶ 18.

Campbell claims that he personally saw Howell show James Summers how to bypass the safety latch and instructed him to do so daily. [DE 44, ¶ 14.] Furthermore, Campbell testified that Summers continued using the protocol despite fear of losing his job. *Id.*, ¶ 15. Campbell further testified that he never received training from a Crossroads Manager about any on-site hazards. *Id.*, ¶ 19. Campbell stated that he and his co-workers complained regularly about the dangerous safety latch practice until Summers died. *Id.*, ¶ 20. Campbell even testified to IOSHA investigators that he witnessed the safety latch tie coming undone and that he had almost lost his life six times. *Id.*, ¶ 21. He also asserted that the management instructed them to use Crane 2 without a safety latch while Howard tied back the hook to Crane 1, because it was "safer to operate" the crane "without a safety latch." *Id.*, ¶¶ 22-23.

IOSHA interviewed many Crossroads employees who had firsthand knowledge of crane safety latch violations. [DE 44, ¶ 26.] These violations included latches being tied back for over six months; Cranes 2 and 3 having safety latches removed; a crane being used for eight hours presumably without a safety latch engaged; Reynolds and Howell knowing about the tying back of safety latch; and Reynolds telling an employee that he worked at another factory without safety latches. *Id.*, ¶¶ 27-28, 36-41. IOSHA concluded that, given the violations, it was "reasonably predictable" that someone might get seriously hurt or killed. *Id.*, ¶ 42; *see* DE 44-3 at 13.

4

A few months before James Summers' death, Howell, Reynolds, and other employees held a meeting where the employees expressed safety concerns. *Id.*, ¶ 29. The employees told management that "someone is going to die. You are going to kill somebody." *Id.*, ¶ 30. Reynolds reportedly responded dismissively, saying, "Whatever they got to bypass to get the job done . . . they can do it, and I don't want to hear no more about it. And *if* someone dies, then we'll come across that when the time comes." *Id.*, ¶ 31 (emphasis added). This contradicts the First Amended Complaint, which claimed that Reynolds essentially forecasted the tragedy by stating, "***When*** someone dies, we'll come across that when the time comes." [DE 20, ¶ 21 (emphasis added).]

On March 11, 2020, Mr. Summers was operating a crane while working at the Crossroads facility in Lafayette, Indiana. The crane he was operating, Crane 1, had a modified hook making it "dangerous[]" to operate. [DE 44 at ¶ 8.] In the process of moving a load with the crane, the load dropped and fell on Mr. Summers causing him serious injury and ultimately led his death. *Id.*

Summers alleges that Crossroads should be held liable in tort in part because Howell and Reynolds are "corporate officers and policymakers" of Crossroads and the employer should thus be accountable for the actions (or inactions) of those corporate officers. *Id.,* ¶¶ 29–32.

## Discussion

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P.

12(b)(6). At this stage, as I noted above, I must accept the complaint's allegations as true and draw all reasonable inferences in Summers' favor. *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19 F.4th 1002, 1006 (7th Cir. 2021). However, to avoid dismissal under Rule 12(b)(6), his claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires a plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Indiana Code § 34-23-1-1 and § 34-23-1-2 permit a decedent's personal representative to "maintain an action" on the decedent's behalf if the decedent "might have maintained an action had he . . . lived." In Indiana, actions for wrongful death are "purely creatures of statute"; at common law "there was no claim in tort for the death of another because a personal injury action did not survive the death of the injured party." *Melvin v. Patterson*, 965 F. Supp. 1212, 1215 (S.D. Ind. 1997) (citing *Ed Wiersma Trucking Co. v. Pfaff*, 643 N.E.2d 909, 911 (Ind. Ct. App. 1994)). Because such actions are purely statutory, they are "strictly construed." *Moore v. Hamilton Southeastern Sch. Dist.*, 2012 WL 13028664, at *4 (S.D. Ind. Sept. 28, 2012). "[O]nly those damages prescribed by statute are recoverable." *Wiersma Trucking*, 643 N.E.2d at 911. Thus, a plaintiff pursuing a wrongful death action may seek "damages . . . limited to the pecuniary loss suffered by those for whose benefit the action may be maintained," such as "the assistance that

the decedent would have provided through money, services, or other material

benefits," and spouses and dependent children may further obtain "emotional

damages," such as "damages for the loss of care, love and affection . . . [and] parental

training and guidance." *Id.*

The IWCA created a process for workers hurt on the job to seek compensation

from their employers. In so doing, the law provides that any "rights and remedies

granted to an employee . . . on account of personal injury or death by accident shall

exclude all other rights and remedies of such employee, the employee's personal

representatives, dependents, or next of kin, at common law or otherwise, on account of

such injury or death." Ind. Code §§ 22-3-2-6. Thus, the IWCA operates coextensively

with the wrongful death statute. It provides an employee's sole remedy against an

employer for injuries occurring by accident, which arise out of and in the course of his

employment. *Sims v. U.S. Fid. & Guar. Co.*, 782 N.E.2d 345, 349–50 (Ind. 2003); *Tippmann

v. Hensler*, 716 N.E.2d 372, 374–75 (Ind. 1999). Where, as here, "a plaintiff's own

complaint recites facts demonstrating the employment relationship and its role in the

injuries alleged," the plaintiff carries the burden "to demonstrate some grounds for

taking the claim outside the Worker's Compensation Act." *Perry v. Stizer Buick GMC,

Inc.*, 637 N.E.2d 1282, 1286 (Ind. 1994).

The exclusive remedy provisions of the IWCA relate to "personal injury or death

arising out of and in the course of employment which occurs '*by accident*.'" *Talevski v.

Carter*, 2006 WL 276927, at *5 (N.D. Ind. Feb. 1, 2006) (emphasis added) (citing *Baker v.

*Westinghouse Elec. Corp.*, 637 N.E.2d 1271, 1273 (Ind. 1994)). What this means is that an employer hurt on the job due to his employer's negligence must seek relief through the worker's compensation system. Such actions brought in a court of general jurisdiction are prohibited.

But as with most things in the law, the ironclad rule set out in the IWCA isn't without its limits. Certain kinds of torts are exempted from the IWCA's exclusivity provision. *Talevski*, 2006 WL 276927, at *5 ("An injury occurs by accident only 'when it is intended by neither the employee nor the employer.' Accordingly, the Workers' Compensation Act does not cover an employer's intentional torts."). Suppose a dispute erupts in the workplace and an employer punches an employee in the face. This type of intentional behavior does not fall within the purview of the exclusive remedy provision of the IWCA. This sensible exclusion was created by the Indiana Supreme Court more than a quarter century ago, in *Baker v. Westinghouse Electric Corporation*. It did so in response to a certified question from the U.S. District Court for the Southern District of Indiana asking "[w]hether there is an intentional tort exception to the exclusivity provision of the Indiana Worker's Compensation Act." *Baker*, 637 N.E.2d at 1272. The Court determined that the IWCA "by its terms does not bar certain intentional tort actions." *Id. See also Owens v. DSM Eng'g Plastics, Inc.*, 641 N.E.2d 1271, 1273 (Ind. Ct. App. 1994).

The Indiana Supreme Court arrived at this conclusion because the language of the IWCA is limited to injuries and death that occur by "accident." *Baker*, 637 N.E.2d at

1272 (citing Ind. Code § 22-3-2-6). Obviously, being bopped in the nose by your boss's balled up fist is no accident. And any injury that would result would be intended and thus fall outside the scope of the IWCA. *Id.* at 1273 ("[I]ntentional torts of an employer are necessarily beyond the pale of the [A]ct."). *See also, e.g., Eichstadt v. Frisch's Restaurants, Inc.*, 879 N.E.2d 1207 (Ind. Ct. App. 2008) (holding that employee failed to establish that injuries were not "by accident," and thus not barred by IWCA, where employee alleged that she was injured when restaurant manager struck her with a clipboard and there was no evidence that the corporate entity intended her injuries).

The Court in *Baker* made it very clear that an employee's requisite "level of intent" demands "nothing short of *deliberate intent to inflict an injury*, or *actual knowledge that an injury is certain to occur*." *Id.* at 1275 (emphasis added). Allegations of reckless or wanton behavior is not enough. *Id.* Only intentional behavior suffices to exempt the claim from the IWCA. What's more, "it must be the *employer* who harbors the intent and not merely a supervisor, manager or foreman." *Id.* In fact, the Court went so far as to say that even when an employer knows that "the injury was substantially certain to occur," that knowledge will not remove resultant harm from the scope of the IWCA. *Id.* at 1275 & n.5.

To sum up: in the context of workplace injuries, only deliberate behavior specifically intended to cause an employee harm will remove a tort claim from the ambit of the IWCA. Not surprisingly, this kind of intentionally tortious behavior on the part of employers is rare.

9

The purpose behind the exclusive remedy provision of the IWCA was summarized by the Court in *Baker*. "Workers compensation obviates the uncertainty, delay, and expense of common law remedies by substituting a fixed compensation according to reimbursement schedules. . . . The act envisions that the costs of no-fault liability will be borne by industry . . . and passed on to the ultimate consumers of products." *Id.* at 1274 (internal citations omitted). But the system only works if it is predictable enough to allow employers to factor the cost of the system into their operations. *Id.* As I noted in my first order of dismissal [DE 41 at 10], the demanding standard enunciated in *Baker* serves important policies: "[A] high standard of culpability" is necessary to "avoid the workmen's compensation scheme being 'swallowed up' by a glut of common law suits outside the Act.'" *Baker*, 637 N.E.2d at 1275 (quoting *Nat'l Can Corp. v. Jovanovich*, 503 N.E.2d 1224, 1233 n.14 (Ind. Ct. App. 1987)).

In sum, *Baker* sets out a clear rule: only intentional torts committed by employers are exempted from the IWCA. Injuries resulting from gross negligence or recklessness, even when those injuries are "substantially certain" to occur, can only be remedied through the worker's compensation system. *Id.* at 1275 & n.5. *See also* DE 44, ¶ 42; DE 44-3 (noting it was "reasonably predictable" that Crossroads' "multiple serious violations" would result in serious injuries, including "broken bones [and] death").

Crossroads notes that *Baker* makes clear that gross negligence, recklessness, or even acts "substantially certain" are insufficient to state a tort claim based on a

workplace injury in light of the IWCA's exclusive remedy provision. [DE 46 at 5–6.] Various panels of the Indiana Court of Appeals, both before and after *Baker*, have reinforced this high standard for establishing an employer's deliberate intent to injure an employee. *Owens*, 641 N.E.2d at 1271 (holding that a defendant acting with wantonness and recklessness by persisting in using the procedure which caused the plaintiff's injury fails to show that the defendant specifically intended the plaintiff's resulting injuries); *Blade v. Anaconda Aluminum Co.*, 452 N.E.2d 1036, 1038 (Ind. Ct. App. 1983) ("Although we may infer from [plaintiff]'s complaint that [defendant] intentionally pursued a course of conduct which jeopardized its worker's safety, no facts were alleged which support an inference that [defendant] intentionally injured [the plaintiff]."); *Agee v. C. Soya Co.*, 695 N.E.2d 624, 628 (Ind. Ct. App. 1998) (holding that knowingly allowing a hazardous work environment or willfully violating safety laws falls short of intentionally causing harm which removes the element of accidentality from the injury); *Williams v. Delta Steel Corp.*, 695 N.E.2d 633, 634 & n.3 (Ind. Ct. App. 1998) (even where plaintiff claimed that the plaint manager's awareness of a dangerous condition proved "actual knowledge that injury was certain to occur," the court held that the plaintiff did not prove his injuries were the "intended product" of the defendant's actions, only citing the supervisor's actions). *See also, e.g.*, *Bailor v. Salvation Army*, 854 F. Supp. 1341, 1353–54 (N.D. Ind. 1994), *aff'd*, 51 F.3d 678 (7th Cir. 1995) (holding that series of detailed, specific acts and omissions taken by employer that allegedly led to plaintiff's violent rape and beating "support[ed] an inference of reckless

or wanton behavior," but fell short of a "course of action taken with the specific intent to cause [the] attack, or with any substantial certainty that an attack would occur").

One case stands out as an outlier. *Lawson v. Raney Mfg., Inc.*, 678 N.E.2d 122, 126–28 (Ind. Ct. App. 1997). There, the Court of Appeals suggested a potential pathway for demonstrating an employer's intent to harm sufficient to remove a case from the purview of the IWCA. In that case, the plaintiff brought an intentional tort claim against her former employer for injuries arising from a tragic work accident. *Id.* at 124. More specifically, the plaintiff suffered the amputation of both of her hands in a punch press machine, on her first day of work, and filed a civil action seeking damages from her employer for her injuries. The court held that the plaintiff failed to plead sufficient facts proving that the employer actually knew that an injury was certain to occur; therefore, she did not demonstrate that her injury was outside the scope of the IWCA. *Id.* at 127–28. In so holding, the court commented on an affidavit submitted by the plaintiff to support her claim. The affidavit was from a professional safety expert criticizing the employer's alleged safety violations. The court determined that the affidavit was not "conclusive by itself" of the employer's knowledge that its shady practices were certain to cause the plaintiff's injuries. *Id.* The court then suggested, in dicta, that the plaintiff could have provided more specific allegations concerning other employees who "suffered similar injuries on the same type of machine," or the number and frequency of complaints submitted to managers about the cited safety concerns, or allegations that the employer "regularly observed and approved the use of the press without guards."

*Id.* at 128. According to the Court of Appeals, such details would have made the aided the inference that the employer had actual knowledge that an injury was certain to occur from the procedure.

As I see it, most of what *Lawson* has to say is dicta, as pertains to what proof is enough to exempt a case from the IWCA. The court had no occasion to rule on the issue. But whether it is dicta or not, *Lawson* strikes me as an outlier in the case law. It simply cannot be squared with many other decisions of Indiana's Courts of Appeals that uniformly hold otherwise.

In *Owens*, for example, it was not enough to show that the plaintiff's injuries were the "intended product" of the screw removal procedure that caused his injury, even where the plaintiff came forth with evidence that the "procedure . . . was known by [his] supervisor to be dangerous" and a supervisor had stated that the "procedure had nearly injured other workers in the past." *Owens*, 641 N.E.2d at 1274. Similarly, the court in *Blade* stated that it was possible to "infer from Blade's complaint that [the defendant] intentionally pursued a course of conduct which jeopardized its worker's safety," but that was not enough to "support an inference that [the defendant] intentionally injured Mr. Blade." *Blade*, 452 N.E.2d at 1038. Likewise, in *Agee*, the court stated that "wilfully and unlawfully violating a safety statute . . . still falls short of the kind of actual intention to injure that robs the injury of accidental character." *Agee*, 695 N.E.2d at 626–27 (citing 2A Lawson, *Workmen's Compensation Law* § 68.13 at 13–15 (1982)). And in *Williams*, the Court of Appeals noted the complaint alleged that the

13

employer's plant manager was "aware of the dangerous condition of the machine that injured [plaintiff] and that, despite such awareness, still required [plaintiff] to use the machine." *Williams*, 695 N.E.2d at 634 n.3. While ruling on a separate issue, the court summarily concluded that these allegations failed to create a reasonable basis to infer that the plaintiff's injuries "were the 'intended product' of [the defendant]'s actions." *Id.* (citing *Foshee v. Shoney's, Inc.*, 637 N.E.2d 1277, 1281 (Ind. 1994); *Baker*, 637 N.E.2d at 1275). Ruling in Summers' favor by adopting a broader view arguably endorsed in *Lawson* would cut against the clear rule announced by the Indiana Supreme Court in *Baker* and the holdings of *Owens*, *Blade*, *Agee*, and *Williams*.

With this Indiana case law as a backdrop, I can turn back to the real question: whether Summers has alleged enough to show that Crossroads intentionally harmed his father. Crossroads surely acted recklessly and in a grossly negligent way. The state authorities concluded as much after a robust investigation into the company's shoddy safety practices. Crossroads also fostered a culture of callous indifference to employee safety, which is simply unacceptable. This is plain as can be from Reynolds' statement: "[W]hatever they got to bypass to get the job done . . . they can do it, and I don't want to hear no more about it. And *if* someone dies, then we'll come across that when the time comes." [DE 44, ¶¶ 31 (emphasis added); DE 44-1 at 78–79.] If this statement is accurate, it is nothing short of shocking. (Who behaves in such a callous way, indifferent to the lives of their hardworking employees – let alone any other human being?) What is more, according to the amended complaint, workers regularly

14

complained about the dangerous safety latch practice until it resulted in Summers'
death, the employees never received training from a Crossroads manager about any on-
site hazards, they witnessed employees regularly operating cranes with safety latches
tied back, and this occurred "every single day," according to Campbell's account.
[DE 44, ¶¶ 11–32.]

The problem, however, is that none of these allegations demonstrate
intentionality on the part of Crossroads, as required by *Baker*. While they may show that
severe injury (or death) was *possible*, they do not create a basis to infer that it was certain
to occur or that Summers' death was the "intended product" of Crossroads' conduct.
*See Owens*, 641 N.E.2d at 1274. Therefore, while I think the issue is close, given the
holding in *Baker* and the many other Indiana appellate courts both before and after
*Baker*, I'm compelled to dismiss the amended complaint.

*   *   *

One could reasonably argue that the clear (but inflexible) rule set out in *Baker*
might create an incentive for employers to cut corners on worker safety. Perhaps this
case tragically proves the point. Implementing safety protocols can be expensive and
adhering to safety requirements can be a nuisance and time consuming. It surely affects
efficiency. Nevertheless, the Indiana Supreme Court has considered the competing
policy concerns and spoken plainly on the issue, and I'm bound to follow it.

### Conclusion

For the foregoing reasons, Crossroads' motion to dismiss [DE 45] is **GRANTED**.

The Second Amended Complaint [DE 44] is **DISMISSED WITH PREJUDICE**, for failure to state a claim in light of the exclusive remedy provision of the Indiana Worker's Compensation Act, Ind. Code § 22-3-2-6. The Clerk is **DIRECTED** to close the case.

       **SO ORDERED**.

       ENTERED: October 27, 2022.

                      /s/ Philip P. Simon
                      PHILIP P. SIMON, JUDGE
                      UNITED STATES DISTRICT COURT